May 10, 2021

**Supreme Court**

No. 2019-239-Appeal.
(15-4016-2)

In re Elana W.                    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Elana W.                          :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Lynch Prata, for the Court.**  The respondent father, Cody W.,[1]

appeals from a decree terminating his parental rights to his daughter, Elana W.  The

respondent argues that the decree should be vacated because, he contends, the trial

justice erred in finding that there was sufficient evidence to support a finding of

parental unfitness.  This case came before the Supreme Court pursuant to an order

directing the parties to appear and show cause why the issues raised in this appeal

should not summarily be decided.  After hearing the arguments of counsel and

thoroughly reviewing the record, we conclude that cause has not been shown and

that this case may be decided without further briefing or argument.  For the reasons

set forth in this opinion, we affirm the decree of the Family Court.

---

[1] To protect the identity of the child, in this opinion we will use the father's first
name and last initial only.

## Facts and Travel

Even before Elana's birth on October 27, 2016, she came to the attention of the Rhode Island Department of Children, Youth, and Families due to her mother's prior involvement with both DCYF and the Massachusetts Department for Children and Families. Elana was immediately placed into the care and custody of DCYF.[2] She was eventually placed in relative foster care with her paternal aunt.

---

[2] Elana's removal from the care of her parents when she was born partly related to the death of her biological mother's second child in an incident involving the child being left alone in a "Rock 'N Play" and the fact that there was a pending termination petition concerning another child of the mother. The respondent was not the father of the other two children. Elana was also removed from her parents' care, according to the decision of the trial justice, "due to issues of police involvement relating to the parents' domestic violence, concerns regarding parenting, substance-abuse, and the need for counseling."

On March 20, 2018, DCYF filed a petition in the Family Court pursuant to G.L. 1956 § 15-7-7[3] seeking to terminate respondent's parental rights to Elana.[4] In its petition, DCYF alleged that Elana had been placed in the legal custody or care of the agency for at least twelve months. During those twelve months, DCYF alleged, respondent had been "offered or received services to correct the situation which led to the child being placed"; DCYF further alleged that, because of Elana's age and

[3] General Laws 1956 § 15-7-7(a) provides, in part:

> "The court shall, upon a petition duly filed by a governmental child placement agency * * * after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:

> "* * *

> "(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

[4] The petition also sought to terminate the parental rights as to the mother. The trial began as to both parents, and, after the mother's testimony, the trial justice appointed both a guardian *ad litem* and an advocate to represent the mother and bifurcated the trial. Once both representatives were in place for the mother, she entered into a mediated direct-consent adoption with Elana's paternal aunt/foster parent, and the petition was dismissed against her. The trial then continued as to only respondent.

need for a permanent home, there was not a substantial probability that she would be able to return safely to respondent's care within a reasonable period of time.

A trial on the termination petition, which was consolidated with a petition alleging neglect, commenced on November 9, 2018, and was held over four days spanning from November 2018 through March 2019.

Leah Crowell, a DCYF caseworker, testified first. Ms. Crowell said that she was assigned to the case in February 2017. She testified that four case plans were developed for respondent and that tasks included substance-abuse counseling, toxicology screens, individual and group counseling, a parent/child evaluation, and individual mental health counseling, as well as obtaining stable employment and proper housing. Ms. Crowell testified that respondent was engaged with the Batterers Intervention Program (BIP) when she was assigned to the case. The record indicates that respondent had been arrested in December 2016 for domestic vandalism and disorderly conduct, in an incident involving Elana's mother, and Ms. Crowell testified that the BIP was required as a part of the disposition of respondent's criminal case. She testified that respondent started the BIP in January 2017 and that, although he was discharged twice for missing classes, he completed the program in September 2017.

Ms. Crowell further testified that DCYF recommended couples counseling to address the domestic violence issues, and she had made a referral to the East Bay

Center for both couples and individual counseling. She testified that respondent failed to contact the East Bay Center after her referral. She also testified that DCYF referred respondent to CODAC for substance-abuse counseling, but that, again, respondent failed to complete the program, the record revealing that he attended only three of the five scheduled appointments.

Ms. Crowell further testified that respondent and mother missed four visits with Elana in January and February 2017 and that respondent had missed the visits because he did not feel that supervision was necessary. Ms. Crowell testified that she then referred respondent to the Families Together program to work on parenting skills, which respondent completed. However, she testified, at a meeting in August 2017 at which respondent's parenting skills were discussed, including feedback on safety concerns, respondent became extremely agitated and told everyone at the meeting that he knew more about child development than anyone in the room, and that he was only using the program as a place to visit with his daughter.

Ms. Crowell also testified that in October 2017 she referred respondent to the Parent Support Network for visitation, which provided for twelve weeks of parenting classes. She testified that respondent initially did not accept the referral because he felt that he did not need help with parenting, but that in January 2018 respondent began the program. However, according to Ms. Crowell, he indicated at that time that "he was above them and better than [the other parents]" and that his involvement

"would only be to benefit them, not him." The visitation program ended when DCYF filed the termination petition, with respondent having completed only three of the twelve parenting classes; he chose not to continue with the program.[5]

Regarding the child, Ms. Crowell testified that Elana was doing well in her pre-adoptive home. She testified that Elana's paternal aunt was her foster mother, that Elana was bonded to her, and that all of Elana's needs were being met.

John Parsons, Ph.D., a licensed clinical psychologist, testified next as an expert in clinical psychology and parenting. He testified that he had completed an evaluation of respondent—conducting an intelligence test, achievement test, personality inventories, and self-report inventories on alcohol and drugs. Doctor Parsons opined that respondent's test results revealed personality disorder, paranoia, mania, and feelings of persecution. Doctor Parsons testified that he recommended psychotherapy and random supervised toxicology screens for three months, noting that compliance with his recommendations was important for purposes of assessing whether respondent was a safe parent.

According to Dr. Parsons, respondent believed that, if the mother had not been involved with DCYF when Elana was born, everything would be fine and Elana could come home with him. Doctor Parsons construed the way that respondent

---

[5] According to Ms. Crowell, respondent had the option of signing up to restart the program at his own expense after the termination petition had been filed, but he did not do so.

talked about Elana's mother as "psychological abuse, rude, * * * ugly and not the way to treat the mother of your baby."

Cindy Ogando, the next witness, testified that she began working with respondent at the Families Together program in April 2017. She testified that she supervised visits with Elana and offered feedback on parenting skills, which she also provided in a report to DCYF for purposes of reunification. She noted that respondent had completed an eighteen-week program, or eighteen visits, and that respondent was cooperative throughout the assessment; however, she also testified that she had recommended that visits remain supervised due to "safety concerns[.]" In her letter to DCYF from the Families Together program, Ms. Ogando identified challenges for respondent related to safely handling Elana and understanding her developmental capabilities. Additionally, Ms. Ogando noted respondent's resistance to suggestions, advice, and feedback related to Elana.

Next to testify at trial was Jamie Paolozzi, a child support technician, who transported Elana to weekly visits with respondent and observed the visits. She testified that she began supervising the visits in late 2017 and that the visits usually went well. Ms. Paolozzi testified that she usually did not have parenting concerns regarding respondent, but occasionally had to redirect him, especially regarding feeding Elana the appropriate bites of food. She also recounted an incident that occurred in September 2018, when respondent was under the influence of pain

medication due to having been stabbed. She testified that, on that occasion, respondent stumbled while putting Elana down, causing Elana to also stumble; Ms. Paolozzi therefore told respondent not to pick up Elana for the rest of the visit because it was not safe. According to Ms. Paolozzi, despite her warning, respondent tried to lift Elana a few more times during that visit. She testified that she ultimately ended the visit because respondent was not listening to her directives and that respondent reacted by asking, "I can't hold my child. I can't pick my child up[?]" and by videotaping Ms. Paolozzi.

The respondent then testified on his own behalf. According to respondent, he was working as a laborer and living with his father and brother, where he paid rent. He testified that he was in an "ongoing relationship" with Elana's mother and that he believed that DCYF had coerced him to do the required programs because of the mother's prior involvement with DCYF. He also acknowledged that he had consumed a beer earlier that morning before going to the courthouse.

In his testimony, respondent admitted that he had been arrested for domestic vandalism in December 2016 when he was living with Elana's mother and that he agreed to attend a domestic violence program and counseling at CODAC as part of the disposition of that case. He also admitted that he had been arrested multiple other times, including another domestic incident against Elana's mother in February 2017. The respondent testified that he had completed drug screens after the child

was removed, as well as another round of screening through the Family Court on the recommendation of Dr. Parsons.

The respondent also directly addressed the court and explained why he believed it was in Elana's best interest to be placed with him. He testified that if he were granted custody of Elana, she would live with him, his father, and his brother. He testified that he would support Elana financially with money earned from work. He testified that he did not own a car and suggested that he would use public transportation or some other means to get Elana to medical appointments. The respondent suggested that his family would care for Elana while he worked.

When the trial justice asked respondent whether he found the parenting programs helpful or whether he needed help with parenting, respondent answered, "No." The respondent further said that he "absolutely [did] not" need mental health counseling.

On April 10, 2019, the trial justice issued a lengthy written decision terminating respondent's parental rights to Elana. After an in-depth review of the testimony and relevant trial exhibits, the trial justice made twenty-two separate findings of fact. She found by clear and convincing evidence that "it is in the best interest of Elana that [respondent's] rights are terminated[.]" She found that recommendations made by Dr. Parsons for couples counseling, weekly psychotherapy, a substance-abuse evaluation, full-time employment, and housing

had not been followed. She also found by clear and convincing evidence that there were no other visitation or parenting programs or services for referral that would improve respondent's ability to parent Elana given his mental health issues, refusal to comply with recommendations by service providers, and failure to attend and engage in substance-abuse treatment. She further found that respondent had displayed tremendous resistance and failed to cooperate with DCYF throughout the case. In addition, she noted that, during the pendency of the case, "there were multiple arrests, bizarre behavior between the parents, [and] domestic abuse and substance abuse[.]"

Additionally, the trial justice found that respondent's chaotic lifestyle, which included criminal activity, fights, drunkenness, domestic violence, and being in a situation in which he was stabbed, rendered him unfit to parent Elana, despite DCYF's extensive efforts. The trial justice determined that respondent's testimony was not credible, noting that it contained "numerous illogical and bizarre explanations" for respondent's police involvement and criminal activities, alcohol use, noncompliance with DCYF and service providers, and domestic abuse against Elana's mother.

The trial justice went on to find that Elana had been in DCYF care since her removal at birth and was in a pre-adoptive home and bonded to that family. She found that reunification was unlikely now or in the foreseeable future given DCYF's

reasonable efforts and respondent's refusal to cooperate. The trial justice concluded that respondent's failure to address his mental health and substance-abuse issues and his refusal to attend counseling also rendered him unfit to parent Elana and that it was in the child's best interest that respondent's parental rights be terminated.

The decree terminating respondent's parental rights was entered on May 17, 2019. The respondent timely appealed.

## Standard of Review

"On appeal, this Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019) (quoting *In re Amiah P.*, 54 A.3d 446, 451 (R.I. 2012)). "These findings are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id.* (quoting *In re Amiah P.*, 54 A.3d at 451). "Such findings must be supported by clear and convincing evidence." *Id.*

## Discussion

On appeal, respondent maintains that the trial justice was clearly wrong to conclude that there was parental unfitness and that there was no substantial probability that Elana could be placed in respondent's care within a reasonable period of time.

"Natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Violet G.*, 212 A.3d at 166 (quoting *In re Amiah P.*, 54 A.3d at 451). Given the drastic and irreversible nature of a decree terminating parental rights, "the right to due process requires that the state support its allegations by clear and convincing evidence." *Id.* (quoting *In re Amiah P.*, 54 A.3d at 451).

"Before terminating a parent's rights to his or her child, the Family Court justice must find that the parent is unfit." *In re Violet G.*, 212 A.3d at 166 (brackets omitted) (quoting *In re Amiah P.*, 54 A.3d at 451). "However, once the Family Court justice determines parental unfitness, the best interests of the child outweigh all other considerations." *Id.* (brackets omitted) (quoting *In re Amiah P.*, 54 A.3d at 451).

In the case at bar, the trial justice found that there was sufficient evidence to support the conclusion that respondent was unfit as a parent and that DCYF had made reasonable efforts to reunify respondent and his daughter. The record reveals that DCYF made numerous referrals and set up services to assist respondent with parenting, substance-abuse, domestic violence, and mental health counseling, yet respondent failed to cooperate. Four case plans were developed for respondent, and, despite DCYF's efforts, respondent did not comply with the case plans. Further, DCYF made efforts to strengthen and encourage the parental relationship as required by § 15-7-7, with the goal of reunifying respondent with his child, for a period of over two years.

The trial justice found, and we agree and discern no error, that although respondent participated in some programs, including the Families Together program, the BIP, and Parent Support Network, and although he had completed Dr. Parsons's evaluations, he was unable or unwilling to fully cooperate with these service providers or follow through with their recommendations. The record shows that respondent rejected feedback on safety concerns from the Families Together program and that he did not follow through on the recommendations by Dr. Parsons—to engage in individual and couples counseling, secure full-time employment and stable housing, obtain a substance-abuse evaluation from CODAC, or complete DCYF's case plans—because he did not believe that he needed any services from DCYF.

For example, respondent's first case plan addressed three risk areas: (1) parenting/empathy/bonding, for which he was required to maintain regular visits and use them as a means to develop a bond; (2) parent/caregiver substance use, for which he was instructed to sign up for substance-abuse intake at CODAC and participate in weekly counseling; and (3) domestic violence, for which he was required to sign up for the BIP. As stated *supra*, the record shows that respondent missed several visits in January and February 2017, because he did not believe that supervised visits were necessary and that, although he completed the BIP, he did not complete the program at CODAC.

Moreover, the second case plan required respondent to demonstrate knowledge of child development and the ability to ensure the safety and well-being of Elana. For this task, respondent was required to engage in the Families Together visitation program, follow all recommendations, demonstrate appropriate co-parenting skills, and complete a psychological parent-child evaluation with Dr. Parsons and follow any recommendations. In addition, respondent was required to address: (1) financial stability as a parent/caregiver, by maintaining a job and an appropriate apartment; (2) the risk of substance-abuse, by engaging in a substance use evaluation at CODAC; and (3) the risk of domestic violence, by completing the BIP and avoiding further legal trouble.

The third case plan provided similar goals. The respondent was required to address substance use by engaging in an evaluation at CODAC; respondent was also required to demonstrate his knowledge of child development and his ability to ensure the safety and well-being of Elana by following the recommendations from the Families Together program; he was required to demonstrate appropriate co-parenting skills by following through with recommendations by the Families Together program; and respondent was required to follow Dr. Parsons's recommendations to engage in individual psychotherapy, random toxicology screens, and couples counseling. The respondent was also required to maintain a job and acquire an appropriate apartment.

The respondent was further required to demonstrate his ability to co-parent by developing communication skills through individual mental health counseling with a cognitive/behavioral approach and attending couples counseling. In addition, respondent was required to address domestic violence by applying the skills learned at the BIP. Again, although he participated in the Families Together program and completed Dr. Parsons's evaluations, the BIP, and the Parent Support Network, respondent failed to fully cooperate with these service providers or follow through with their recommendations. In addition, respondent failed to obtain a substance-abuse evaluation from CODAC or secure full-time employment and suitable housing.

The record is also devoid of any evidence regarding respondent's fitness to parent Elana. This Court has said that the "refusal to cooperate with the objectives of the case plans constitutes clear and convincing evidence of [a] lack of interest in [the child] and, as such, could properly serve as a basis for a finding of parental unfitness." *In re James H.*, 181 A.3d 19, 27 (R.I. 2018). Because the goal of reunification is to get the parent to a place where they have the ability to successfully parent their child, a parent must do more than just check the boxes. There must be a demonstrated showing of an effort on the part of the parent. Merely completing some of the referred programs, without the accompanying behavior change, is not enough to support reunification. We believe that there is sufficient evidence in the

record to support the trial justice's finding that respondent was not fit given his failure to fully engage in the services provided by DCYF.

After a determination of parental unfitness has been made, and after a showing of reasonable efforts at reunification, the Court's analysis "shifts to the overarching issue of the best interests of the child," which outweighs all other considerations. *In re Violet G.*, 212 A.3d at 167. "A determination of the best interests of a child includes 'the right of a minor child to reasonable care and maintenance, freedom from abuse or neglect, and the right to be given an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive.'" *In re Christopher B.*, 823 A.2d 301, 317 (R.I. 2003) (quoting *In re Stephanie*, 456 A.2d 268, 271 (R.I. 1983)).

Here, the trial justice determined that respondent's "mental health issues and 'erratic behavior' * * * render[ed] him unfit to parent Elana." Additionally, Ms. Crowell's testimony showed that Elana had remained in her foster home for more than two years, that she was happy and comfortable in the home with her paternal aunt and her partner, and that all her needs were being met. The record also reveals that Elana was safe in her foster home and, during Ms. Crowell's visits, she was frequently laughing and engaged with the family members. Based on the testimony at trial about Elana's well-being, the trial justice concluded that "it is in [the child's]

best interest that she be adopted by her foster family due to the father's inability to care for her now or in the foreseeable future."

We are mindful of the "significance of severing the bond between parent and child[.]" *In re Violet G.*, 212 A.3d at 168 (quoting *In re Alexis L.*, 972 A.2d 159, 170 (R.I. 2009)). Nonetheless, we are satisfied that the trial justice appropriately determined that the termination of the respondent's parental rights was in the best interests of the child. *See In re Alexis L.*, 972 A.2d at 170 (explaining that "[a]lthough this Court is ever cognizant of the significance of severing the bond between parent and child, it is in the best interests of children to have a safe and nurturing environment in which to live, learn[,] and grow").

## Conclusion

For the reasons set forth in this opinion, the decree of the Family Court is affirmed. The record in this case may be returned to the Family Court.

-17-



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Elana W. |
| **Case Number** | No. 2019-239-Appeal. (15-4016-2) |
| **Date Opinion Filed** | May 10, 2012 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Newport County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Laureen D'Ambra |
| **Attorney(s) on Appeal** | For Petitioner: <br><br> Dianne L. Leyden <br> Department of Children Youth and Families <br><br> Laurel C. Ferrelli <br> Court Appointed Special Advocate |
| | For Respondent: <br><br> Kara J. Maguire <br> Office of the Public Defender |